UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JOHNATHAN ROBINS,                          :
                                           :
              Plaintiff                    :
                                           :
       v.                                  :  CIVIL NO. 3:CV-12-2135
                                           :
C.O. TRUE, *et al.*,                       :  (Judge Kosik)
                                           :
              Defendants                   :

**<u>MEMORANDUM</u>**

This civil rights action pursuant to 42 U.S.C. § 1983 was initiated by Plaintiff,

Johnathan Robins, an inmate currently confined at the State Correctional Institution at

Rockview, Pennsylvania.  The only remaining defendant is Brian Burke.  Presently pending

is Burke's motion for summary judgment (Doc. 30).  For the reasons that follow, the motion

will be granted.

## I.      BACKGROUND

On May 25, 2011, Plaintiff and approximately fifteen (15) other inmates were waiting

at SCI-Camp Hill for transport to SCI-Smithfield.  Employees from SCI-Pittsburgh,

including Defendant Correctional Officer Burke, were preparing the inmates for the

transport. (Doc. 1, Compl. at 1-2.)  Burke assisted with the strip searches that were conducted

before the inmates were permitted to exit SCI-Camp Hill, and travel by bus to other

Pennsylvania Department of Corrections institutions.  Plaintiff claims that Burke moved

eight inmates, including Plaintiff, into one cell and instructed them to strip naked.  None of

the inmates were directed to turn around or to face the wall when Burke conducted the visual strip search of Plaintiff and another inmate at the same time.  Both inmates were directed to show their genitals and spread their buttocks in unison.  After the search was concluded, Plaintiff complained to Burke that it was improper.  An unknown staff member asked Plaintiff if he was planning to file a grievance.  When Plaintiff responded in the affirmative, the staff member remarked that Plaintiff "must not want his property." (*Id.* at 2.)

Plaintiff alleges that while there were plenty of empty seats on the transport bus, staff pulled he and another inmate out of line, and made them sit in the caged section of the bus where the Restricted Housing Unit inmates usually sit.  He believes this was for the purpose of intimidation.  He further alleges that when he was dropped off at SCI-Smithfield, his property was left on the bus by staff so it would go to SCI-Pittsburgh.  The property was returned to him the following day. (*Id*. at 3.)

Based on the foregoing, Plaintiff claims that Burke violated his Eighth Amendment rights with respect to the manner in which he conducted the strip search.  (*Id*. at 4.)  He also claims that his First Amendment right was violated when an attempt was made to intimidate him from seeking redress through the grievance system by seating him in the caged section of the bus and leaving his property on the bus.  (*Id*.)   As relief, he seeks monetary damages.

On July 3, 2014, Defendant filed the pending motion for summary judgment.  (Doc. 30.)  A supporting statement of material facts, brief and exhibits were also filed.  (Docs. 31, 32.)

By Order dated October 22, 2014, Plaintiff was directed to file a brief in opposition to Defendant's motion.  (Doc. 33.)  On November 10, 2014, he filed a brief in opposition to the

motion.  (Doc. 34.)  Because the court was advised by correspondence from defense counsel
that Plaintiff may not have received the motion for summary judgment, and that it had been
remailed to him, Plaintiff was afforded additional time to submit opposition to the motion.
(Docs. 35-38.)  On December 22, 2014, Plaintiff filed his response to Defendant's statement
of material facts and brief in opposition to the summary judgment motion. (Doc. 39.)  No
supporting evidentiary documents in support of his filings were submitted.

## II.   STANDARDS OF REVIEW

Summary judgment should be rendered if the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Turner
v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that
the mere existence of *some* alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the requirement is that there be
no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48
(1986)(emphasis in original).  A disputed fact is "material" if proof of its existence or
nonexistence would affect the outcome of the case under applicable substantive law.  *Id.*;
*Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material
fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the
nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of
Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of
a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once such a showing has been made, the non-moving party must go beyond the pleadings

with affidavits or declarations, depositions, answers to interrogatories or the like in order to

demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56;

*Celotex*, 477 U.S. at 324; *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574,

586 (1986)(stating that the nonmoving party "must do more than simply show that there is

some metaphysical doubt as to the material facts").  The party opposing the motion must

produce evidence to show the existence of every element essential to its case, which it bears

the burden of proving at trial, because "a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial."

*Celotex*, 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

The nonmoving party "cannot rely on unsupported allegations, but must go beyond pleadings

and provide some evidence that would show that there exists a genuine issue for trial."  *Jones*

*v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000).  "Inferences should be drawn in

the light most favorable to the non-moving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW,*

*Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507

U.S. 912 (1993).

## III.    STATEMENT OF UNDISPUTED FACTS[1]

Except where expressly noted as disputed, the following facts of record are

---

[1]  Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

undisputed.

On May 25, 2011, Officer Burke was one of three SCI-Pittsburgh employees who were transporting inmates, including Plaintiff, from SCI-Camp Hill to SCI-Smithfield. (Doc. 3, Def.'s Statement of Undisputed Material Facts ("SMF"), ¶ 1; Doc. 39, Pl.'s SMF, ¶ 1.)

The DOC has a written policy, DC-ADM 203, regarding searches of inmates and their property. (Docs. 3, 39, ¶ 2; Doc. 31-1, Ex. C, Declaration of Major Lee Estock; Att. 1, DC-ADM 203.)  DC-ADM 203 requires strip searches in the following circumstances: upon reception, returning after leaving the facility, periodically for inmates permitted to move in and out of gate areas, upon entering or leaving any restricted area, and prior to being transported outside the secure perimeter.  (*Id.*, Estock Decl. ¶ 3, Att. 1 § VI.G.2.a.)  The DOC policy further states that a "strip search should be conducted in an area separate from other inmates and to assure privacy and minimum embarrassment." (Estock Decl. ¶ 4, Att. 1 § VI.G.2.b.)

On May 25, 2011, Plaintiff was being transported outside the secure perimeter of SCI-Camp Hill to another institution, SCI-Smithfield.  (Docs. 3, 39, ¶ 5; Doc. 31-1, Ex. B, Pl.'s Dep. at 17.)  Pursuant to DOC policy, prior to leaving SCI-Camp Hill, Plaintiff was taken with seven other inmates being transferred as a group to a holding cell to be searched. (*Id.*, Pl.'s Dep. at 21; Doc. 31-1, Ex. A, Compl. at 2.)

Plaintiff cannot remember details about what was occurring around him prior to this search because he was not paying attention to anything until his person was being searched. (Doc. 31-1, Robins Decl. at 19, 22, 26, 32.)  Plaintiff disputes this statement to the extent that, while he may have said he really wasn't paying attention and does not remember certain

things, it did not mean that he did not pay attention to everything.

In the holding cell, Burke gave verbal commands to Plaintiff and the inmate next to him to disrobe, then show their hands, turn around, squat, cough, and allow a visual inspection of all body parts. (*Id*. at 14-15, 30.) Plaintiff and the other inmate lifted and separated their genitals and spread their buttocks at the same time. (*Id*. at 15.) Plaintiff admits that no one touched him during the search, a cavity search was not performed, and the search was visual only. (*Id*. at 30.) Plaintiff was embarrassed by the search due to the group setting because other inmates were allowed to view Plaintiff as he was being strip searched. (*Id*. at 26-30.)

After the search was complete and Plaintiff was dressing, he asserted that the search was improper. (*Id*. at 27.) Plaintiff admitted that he was strip searched in a group setting many other times without complaint. (*Id*. at 34.) However, he claims that this search was different because the other inmates were allowed to view his strip search and he was directed to strip search in unison with another inmate. (*Id*.)

Plaintiff either packed up his property to be transferred that morning or the day before. (*Id*. at 11-12.) Defendant Burke and other staff were generally in control of his box of property. (*Id*. at 16.) Plaintiff was told by a SCI-Camp Hill staff person that he must not want his property. Plaintiff states that even though this remark was made by an SCI-Camp Hill employee, it was still Defendant who had control over his property. (*Id*. at 15.) In his boxes of property to be transferred, Plaintiff had "[j]ust basically paperwork, legal paperwork, maybe a little bit of cosmetics. That's just about it. Nothing really important." (*Id*. at 11.)

When the bus arrived at SCI-Smithfield, Plaintiff's property was missing.  The box had continued on the bus to SCI-Pittsburgh.  (*Id*. at 42.)  He received his property, all in the same condition as when it was shipped, either a day or two immediately after his transfer.  (*Id*. at 13, 17.)  Plaintiff admits that it seemed coincidental that the delay in receiving his box of property followed an unnamed staff person's comment about not wanting his property.  (*Id*. at 17-18.)

With respect to the bus transfer from SCI-Camp Hill to SCI-Smithfield, Plaintiff was taken out of line and told to sit inside a caged seat by an officer other than Defendant Burke.  (*Id*. at 16.)  Plaintiff felt that unidentified staff were attempting to intimidate him by putting him inside the caged seat on the bus.  (*Id*. at 16, 18.)

The grievance system consists of: (a) an initial review by a Facility Grievance Coordinator; (2) appeal to the Facility Manager or designee; and (2) appeal to the Secretary's Office for final review.  (Doc. 31-1, Ex. D, Declaration of Helen Shambaugh, ¶ 3.)  In the initial grievance, the inmate must "include a statement of the facts relevant to the claim.  The statement of facts shall include the date, approximate time and location of the event(s) that gave rise to the grievance.  The inmate shall identify individuals directly involved in the event(s)."  (*Id*. at ¶ 4.)  Moreover, the "inmate will also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.  If the inmate desires compensation or other legal relief normally available from a court, the inmate shall request the specific relief sought in his/her initial grievance."  (*Id*. at ¶ 5, Att. 1 at 1-2, ¶ 12.)  Pursuant to DC-ADM 804, only issues raised in the inmate's initial grievance may be appealed.  (*Id*., Shambaugh Decl. ¶ 6, Att. 1 p.2-1, § 2.A.1.c.)

Plaintiff's initial grievance to prison authorities concerned the strip search and the delay in receiving property.  It was assigned grievance number 367741.  (*Id*., Shambaugh Decl. ¶ 8, Att. 2.)  The initial review response is dated June 14, 2011.  (*Id*.)

Inmates may appeal an initial review response to the Facility Manager within fifteen working days from the date of the initial review response.  (*Id*. at ¶ 9, Att. 1 p. 2-1, § 2.A.1.a.)  An exception to the fifteen-day filing requirement will be made only if the inmate notifies the Facility Manager of the reason for the delay, and it is determined that the delay was due to: 1) temporary transfer outside the facility, 2) permanent transfer to another facility, 3) authorized temporary absence from the facility, or 4) another delay with mail delivery.  (*Id*. at ¶ 9, Att. 1 p. 2-2, §2.A.2.c.)

Defendant states that Plaintiff was therefore required to appeal to the Facility Manager by July 6, 2011. (*Id*., Shambaugh ¶ 11.)  Plaintiff's appeal to the Facility Manager is dated August 15, 2011.  (*Id*. at ¶12, Att. 2.)   His appeal was not received by the Facility Manager until August 18, 2011.  (*Id*. at ¶ 13.)  Plaintiff disputes that his appeal to the Facility Manager was due by July 6, 2011.  Rather, he states that if his appeal was dated August 15, 2011, then he more than likely received his response to the initial review response no more than 3-4 days prior thereto because he always filed within the required time limits.  Even though the initial review response is dated June 14th, he states it must have been sent to him late.  As such, he states that his appeal to the Facility Manager dated August 15, 2011 was timely.  (Doc. 31-1, Pl.'s Dep. at  45-46.)

Defendant states that Plaintiff asserted no reasons for the lateness of his appeal to the Facility Manager, and to do so now would be untimely.  (Doc. 31-1, Shamburgh Decl. ¶ 14,

Att. 2.)  Plaintiff disputes that his appeal was late for the reasons set forth above.  (Doc. 31-1, Pl.'s Dep. at 46.)  He further asserts that the Facility Manager accepted his appeal as timely, and did not dismiss it on that basis.  (Doc. 31-1, Ex. D, Att. 2 at 113.)

The Facility Manager's response is dated September 8, 2011.  (*Id.*, Shambaugh Decl. ¶ 15, Att. 2.)  An inmate may then appeal to final review within fifteen working days from the date of the Facility Manager's decision.  (Doc. 31-1, Shambaugh Decl. ¶ 16, Att. 1 p. 2-3, § 2.B.1.b.)  Exceptions to the fifteen-day requirement will be made only where the inmate provides the reason for the delay, and it is determined that the delay was due to one of the four reasons set forth above.  (*Id.* at ¶ 17, Att. 1 p. 2-3 – 2-4, § 2.B.1.c.)

Defendant asserts that Plaintiff was therefore required to appeal to final review by September 29, 2011.  (*Id.* at ¶ 18.)  Plaintiff disputes this statement claiming he received the Facility Manager's decision late, and stated so in his final appeal.  He does not remember the date he received it, but believes it was in October some time, probably around October 12, 2011. (Doc. 31-1, Pl.'s Dep. at 48-49; Ex. D, Att. 2.)

Plaintiff's appeal to final review is dated October 19, 2011.  (*Id.*, Shambaugh Decl. ¶ 19, Att. 2.)  His appeal to final review was received on October 24, 2011.  (*Id.* at ¶ 20.)

Defendant states that although Plaintiff asserted that he had received the answer the week prior, he provided no details as to the specific date it was received, how it was received, why he had only received it the week prior, or whether his inability to appeal was of his own doing.  (*Id.* at ¶ 21, Att. 2.)  Plaintiff partially agrees with this statement, but adds that he has no way of knowing why he received the Facility Manager's decision late.

At the final level of review, based upon the documents provided by Plaintiff in his

appeal, it could not be determined that an exception to the fifteen-day filing requirement was warranted due to circumstances beyond the control of Plaintiff. (*Id.* ¶ 22, Att. 2.) Plaintiff disagrees with this statement in so far as Defendant asserts it to be a fact. Rather, he states that the determination that the fifteen-day exception was not warranted was a judgment call or opinion by final review staff. In any event, Plaintiff's grievance was dismissed because it was not timely submitted. (*Id.* at ¶ 23, Att. 2.)

Since Plaintiff failed to challenge the basis for any events on the bus in his initial grievance, the alleged instruction for him to enter the caged seat was not considered on appeal in the prison grievance system. (Doc. 31-1, Shambaugh Decl. ¶ 24, Att. 2.) In addition, Defendant asserts that since Plaintiff failed to allege that Defendant Burke had any involvement in his property being delayed, the possibility of Burke's involvement was not considered on appeal in the prison grievance system. (*Id.*, Shambaugh Decl. ¶ 25, Att. 2.) Plaintiff disputes this latter statement. He claims that in his grievance he stated that Defendant was one of the officers on the bus that went to SCI-Pittsburgh, and therefore it is inferred that he is one of the officers who is responsible for the property on the bus. (Doc. 31-1, Ex. D, Att. 2.)

## IV.   DISCUSSION

### A.   *Exhaustion*

The Prison Litigation Reform Act of 1995 ("PLRA"), as amended 42 U.S.C. § 1997e, requires prisoners to present their claims through an administrative grievance process before seeking redress in federal court. The Act specifically provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by

a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  An inmate must comply with the PLRA exhaustion requirement as to any claim that arises in the prison setting, regardless of the nature of the claim or of the relief sought.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[I]t is beyond the power of ... any ... [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."  *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000). Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant.  *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)(reasoning that "[p]rison officials are likely to have greater legal expertise and, as important, superior access to prison administrative records in comparison to prisoners").

Further, the PLRA mandates that an inmate "properly" exhaust administrative remedies before filing suit in federal court, which demands compliance with an agency's deadlines and other procedural rules.  *Woodford v. Ngo*, 548 U.S. 81, 92 (2006); *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004)(concluding that the PLRA includes a procedural default component); *Rivera v. Pa. Dep't of Corr.*, 388 F. App'x 107, 108 ( 3d Cir. 2010)("An inmate must exhaust his administrative remedies *prior* to filing a civil action in federal court.")(emphasis added).  A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim.  *McKinney v. Kelchner*, No. 1:CV-05-0205, 2007 WL 2852373, *3 (M.D. Pa. 2007)(*citing Spruill*, 372 F.3d at 227-32; *Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000)).

The DOC's Policy entitled "Inmate Grievance System," DC-ADM 804, provides a multi-step administrative grievance appeal process as outlined above.  Defendant first moves for summary judgment on the basis of failure to exhaust, because the initial review response to Plaintiff's grievance was dated June 14, 2011, thereby requiring any appeal to the Facility Manager to be filed by July 6, 2011.  Plaintiff's appeal to the Facility Manager was dated August 15, 2011, and received August 18, 2011.  As such, the appeal was filed over one month late, and no reasons for the lateness were asserted in the appeal.

Further, the decision from the Facility Manager was dated September 8, 2011, requiring any appeal to the Secretary's Office to be filed by September 29, 2011.  Plaintiff's appeal to the Secretary's Office was dated October 19, 2011, and received October 24, 2011, making the appeal almost three weeks tardy.  Although Plaintiff stated in his appeal to the Secretary's Office that he did not receive the Facility Manager's response until the week prior to the filing of his final appeal, his appeal was dismissed as untimely.

None of the foregoing facts are disputed by the parties.  Rather, Plaintiff contends that his appeal to the Facility Manager should not be considered untimely because the Facility Manager did not dismiss it as untimely.  Instead, his grievance was addressed on the merits. The court agrees.

However, the court does not agree that Plaintiff exhausted his claims at the final level of appeal.  There is no dispute of fact that his appeal was late by almost three weeks.  While in his appeal Plaintiff did claim that he only received the Superintendent's response "last week", he did not provide any details with respect to the specific date it was received, how it was received, why he had only received it the week prior, or whether his inability to appeal

was of his own doing.  (Doc. 31-1, Shambaugh Decl ¶ 21.)  The Secretary's Office dismissed the appeal as untimely, based upon the documents provided by Plaintiff in his appeal, and the fact that it could not be determined that an exception to the 15-day filing requirement was warranted due to circumstances beyond Plaintiff's control in accordance with DC-ADM 804, p. 2-3–2-4, § 2.B.1.c.  (Id. ¶ 17.)  Based on the foregoing, it is clear that Plaintiff failed to exhaust the claims contained in his grievance, which consisted of his challenges to the strip search and the alleged retaliatory property deprivation.

Defendant also seeks summary judgment on the basis of failure to exhaust with respect to Plaintiff's claim of being made to sit in the caged area on the transport bus.  For the sake of argument, even if Defendant Burke had been involved in the instructions to have Plaintiff sit in the caged area, this claim was never raised in a grievance and exhausted through the inmate administrative grievance appeal process.  As such, it is clearly unexhausted, and summary judgment is warranted in favor of Defendant on this claim as well.

Finally, even if Plaintiff had exhausted his property delay claim through the final level of appeal, summary judgment is still warranted in favor of Defendant.  Nowhere in his grievance did he allege personal involvement by Defendant Burke with respect to the delay of his boxes of property.  As such, he cannot now raise this issue in the pending § 1983 action.  See Spruill, 372 F.2d at 222.

Based on the above, it appears that Defendant is entitled to summary judgment on the basis of Plaintiff's failure to exhaust his claims as required pursuant to 42 U.S.C. § 1997e.  However, even if he had exhausted, summary judgment is still warranted in Defendant's

favor with respect to both his Eighth and First Amendment claims for the following reasons.

B.   *First Amendment*

Plaintiff alleges that Defendant violated his rights under the First Amendment by retaliating against him for stating that he was going to file a grievance with respect to the strip search, seating him in the caged area on the bus, and delaying the receipt of his property.

The First Amendment offers protection for a wide variety of expressive activities. *See* U.S. Const. Amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities may infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001)(quoting *Allah*, 229 F.3d at 225).

The last *Rauser* prong requires a prisoner to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him.  The court employs a burden-shifting regime to determine whether a causal link exists.  The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or to retaliate against him. *See id.* (*citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  The burden then shifts to the defendants to prove by a preponderance of the

evidence that they would have taken the same disciplinary action even in the absence of the protected activity. *See id.*  If defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action. *See id*. at 334.

As set forth above, the court has found that Plaintiff did not exhaust his administrative remedies with respect to the caged seating and delay of property issues.  However, even if he had, his retaliation claim is without merit for the following reasons.  Defendant does not argue that the filing of a grievance or complaint is not constitutionally protected conduct. Rather, he maintains that Plaintiff suffered no adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  The undisputed records support Defendant's position for the following reasons.  Here, Plaintiff states an SCI-Camp Hill staff member told him that he must not want his property.  In addition, Plaintiff felt that an unidentified staff member attempted to intimidate him by putting him inside the caged seat on the bus.

Such harassment does not rise to the level of an Eighth Amendment violation unaccompanied by injury or damage, and thus is not cognizable under § 1983.  *See Johnson v. Glick*, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973); *Baylor v. Pa. Dep't of Corrections*, No. 1:12-CV-341, 2013 WL 5177573, *3 (M.D. Pa. Sept. 13, 2013.)  Further, even if Plaintiff's claims are true, the undisputed evidence demonstrates that he engaged in the constitutionally protected activities of filing a prison grievance with respect to his claims and initiating this lawsuit.  Clearly, Plaintiff was not deterred from exercising his First Amendment rights.  As such, Defendant is entitled to summary judgment on the retaliation claims.

15

In addition, Plaintiff fails to demonstrate a sufficient causal link in attempting to set forth a retaliation claim against Defendant in light of the undisputed record.  The only evidence Plaintiff points to in support of his assertion of retaliation is that he was told by a SCI-Camp Hill staff person that he must not want his property.  (Doc. 31-1, Ex. B, Robins' Decl. at 15.)   While Plaintiff argues that Defendant and other staff were generally in control of his property, his conclusion that Defendant had any role in his property not making it off the bus at SCI-Smithfield is purely speculative and unsupported.  In fact, Plaintiff himself even refers to the incident as "coincidental."  (*Id*. at 27-28.)  The record further demonstrates that although the property continued on the bus to another prison, it was promptly returned to Plaintiff the following day undisturbed.  (*Id*. at 23.)

For all of the foregoing reasons, the court finds that summary judgment should be granted in favor of Defendant Burke on Plaintiff's First Amendment retaliation claim.

C.     *Eighth Amendment*

Plaintiff claims that the strip search was conducted in violation of the Eighth Amendment.  A prisoner's challenge to a strip search may be cognizable under 42 U.S.C. § 1983 through the Fourth or Eighth Amendments.  See Gutridge v. Chesney, Civ.A. 97-3441, 1998 WL 248913, *4 (E.D. Pa. 1998), *citing Bell v. Wolfish*, 441 U.S. 520 (1979).  To raise a Fourth Amendment claim the prisoner must allege that the strip search was unreasonable.  *See Payton v. Vaughn*, 798 F.Supp. 258, 261-62 (E.D. Pa. 1992).  Where a prisoner alleges that the strip search was conducted in a physically abusive manner, the Eighth Amendment applies.  *See Jordan v. Cicchi*, 428 F. App'x 195, 199-200 (3d Cir. 2011)(explaining that an excessive force claim arising from a strip search may proceed under

either the Fourth Amendment or the Eighth Amendment, but the latter is "the primary source of protection after an individual's conviction"); *Robinson v. Ricci*, 2012 WL 1067909, *17 n.6 (D.N.J. 2012)(stating that, in addition to a possible Fourth Amendment violation, the "Eighth Amendment may be implicated where the strip search or visual body cavity search was conducted in a brutish and unreasonable manner").  Plaintiff specifically states throughout his pleadings that he brings his claim under the Eighth Amendment and alleges the strip search was cruel and unusual.

"The Cruel and Unusual Punishments Clause of the Eighth Amendment proscribes 'punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 417 (3d Cir 2000)(footnote omitted)(quoting *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).  In order to establish an Eighth Amendment claim, a plaintiff must first prove "a sufficiently serious objective deprivation."  *Tillman*, 221 F.3d at 418.  This objective component is narrowly defined. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).  The Eighth Amendment does not mandate that prisons be free of discomfort.  *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).  Only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. *Id*.  A prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single,

identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)(*citing Rhodes*, 452 U.S. at 347). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997).

An Eighth Amendment violation occurs when the prison official is deliberately indifferent to inmate health or safety and when this act or omission results in the denial of "the minimal civilized measure of life's necessities." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Therefore, a prison official can be held liable under the Eighth Amendment for denying humane conditions of confinement, if he knows that inmates face a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate it. *See id.* at 847. Claims of negligence, without a more culpable state of mind, do not constitute "deliberate indifference." *See Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 193 n.2 (3d Cir. 2001).

In the instant case, Plaintiff does not argue that Defendant was without authority to perform a strip search in light of the fact that he was preparing for transit to another correctional facility. It is well-established that prison officials may conduct visual body cavity searches whenever an inmate enters and exists his cell in the RHU, if performed in a reasonable manner, *see Millhouse v. Arbasak*, 373 F. App'x 135, 137 (3d Cir. 2010)(*citing Bell*, 441 U.S. at 559-60, as well as before/after contact visits, before/after being outside the prison, and before/after a segregated prisoner has mixed with general population without supervision or restraints, *see Miller v. Trometter*, No. 4:11-cv-811, 2012 WL 5933015, * 16 (M.D. Pa. Nov. 27, 2012) *citing Goff v. Nix*, 803 F.2d 358, 366-67 378 (8th Cir. 1986)).

The undisputed record also demonstrates, and Plaintiff admits, that the search was not conducted in an abusive fashion or with excessive force. *See Payton*, 798 F.Supp at 261-62 (dismissing the prisoner's Eighth Amendment challenge to the strip search because he did not allege that the search was conducted with unnecessary force, and embarrassment does not offend the Constitution). Plaintiff admits that Burke never touched him, that no cavity search was performed, and that only a visual strip search took place. (Doc. 31-1, Robins Decl. at 30, 40.)

Rather, Plaintiff bases his Eighth Amendment claim on the fact that he and 7 other inmates were taken to a cell, instructed to strip naked, and then a visual strip search of he and another inmate were performed at the same time while the other six (6) inmates had the ability to observe. He argues that the other inmates should have been instructed to turn and face the wall during his search. He also appears to take issue with the fact that he was searched at the same time as another inmate.

Inmates do not have a right to be free from strip searches. *See Bell*, 441 U.S. at 558. Although a person has a basic right of privacy in his naked body, and several other male inmates saw Plaintiff nude, any such right is limited in the prison context and ordinarily accepted in the routine of the prison. *See Solan v. Ranck*, No. 1:CV-06-0049, 2007 WL 4111424, *9 (M.D. Pa. Nov. 16, 2007). With respect to strip searches, the objective component of the Eighth Amendment is satisfied by any unnecessary nakedness, and the subjective component by the intent to humiliate Plaintiff in doing so. (*Id*. at *8.)

Evidence in support of each of these components is wholly lacking in the instant record. Pursuant to DC-ADM 203, every inmate is subject to search at any time. (Doc. 31-1,

Ex. C at 75.)  Further, a strip search is authorized for the security and good order of the facility prior to an inmate's transport outside the secure perimeter of the prison.  (*Id.* at (G)(2)(a)(9).  The policy also provides that a strip search *should* be conducted in an area separate from other inmates and to assure privacy and minimum embarrassment. (Id. at 76, 2(b).)(emphasis added.)  However, "a prison policy manual does not have the force of law and does not rise to the level of a regulation . . . a violation of internal policy does not automatically rise to the level of a Constitutional violation."  *Atwell v. Lavan*, 557 F.Supp.2d. 532, 556 n.24 (M.D. Pa. 2007)(internal citations omitted.)

It is also well-established that deference is afforded to the prison officials who are in the position of making daily decisions regarding institutional operations.  *See Turner v. Safley*, 482 U.S. 78, 84-88 (1987). While Plaintiff may have preferred to be searched alone, there is evidence in the record establishing that he had been strip searched before in group settings, and never complained.  While on those occasions, the other inmates may have been directed to turn away while Plaintiff was searched, embarrassment is not enough to state a violation of the Constitution.  *Payton*, 798 F. Supp. at 261-62.  In fact, in the Fourth Amendment context, several courts in analyzing strip search claims have found that strip searches of prisoners in the presence of other inmates and staff are not constitutionally defective , especially in light of legitimate security concerns.  *See, e.g., DiFilippo v. Vaughn*, No. CIV.A. 95-909, 1996 WL 355336, *2 (E.D. Pa. 1996); *Elliot v. Lynn*, 38 F.3d 188 (5th Cir, 1994), *cert. denied*, 115 S.Ct. 176 (1995)(visual body cavity search conducted in presence of other inmates and correctional officers reasonable in context of legitimate security concerns); *Franklin v. Lockhart*, 883 F.2d 654 (8th Cir. 1989)(legitimate security

20

concerns justified conducting strip searches in view of other inmates); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988)(strip searches conducted in hallway reasonable in light of legitimate security and safety considerations. )

Moreover, Plaintiff is not even certain whether any of the other inmates in the cell actually looked at him while he was being searched. (Doc. 31-1 at 37, 38.) He also admits that he did not object to the format of the search until after it was concluded. (*Id*.)

More importantly, the uncontroverted evidence establishes that there were no other cells available at the time of the search to separate all of the inmates being transported and to search them separately. The other cells were full since SCI-Graterford had arrived earlier with a bus of inmates. As such, since other cells were unavailable, the 16 inmates in Plaintiff's group to be transported were divided in half, with each half going into one of two available cells to be searched. (Doc. 31-1 at 111, 6/14/11 Response to Grievance 367741.) Plaintiff offers no evidence to dispute this fact, and states that he cannot remember whether other cells were available at the time of the search.[2] (Doc. 31-1, Robins' Decl. 19-32.)

Based on the foregoing, the record is completely void of any evidence that Defendant conducted Plaintiff's strip search in an abusive manner or with excessive force. Plaintiff does not allege that he was physically touched, or that Burke knew of and disregarded an excessive risk to his health or safety. This was not a situation where Plaintiff was paraded

---

[2] Any argument by Plaintiff that the searches should have been conducted earlier is unconvincing and unsupported by the record. While Plaintiff and the other inmates may have been waiting for the transport for three hours, they were searched right before boarding the bus, which clearly is consistent with the purpose of a security search just prior to departure from a prison.

through the prison hallways and intentionally put on display.  Rather, the other inmates in the

cell were also naked, and the search was conducted for security purposes in a professional

and prompt manner, under the circumstances existing at the time that it occurred.

Embarrassment alone, because of casual observances by others, does not offend the

Constitution.  *Payton*, 798 F.Supp at 262; *Michenfelder*, 860 F.2d at 333-34.  For these

reasons, even assuming the Eighth Amendment strip search claim had been exhausted by

Plaintiff, summary judgment is still warranted in favor of Defendant with respect to this

claim.

## V.      CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment will be

granted.  An appropriate order follows.